

# THE IOWA DISTRICT COURT FOR APPANOOSE COUNTY

| | |
|---|---|
| NORTHEAST MISSOURI ELECTRIC POWER COOPERATIVE, <br><br>     Plaintiff <br><br> vs. <br><br> ITC MIDWEST, LLC, <br><br>     Defendant. | CASE NO. _____ <br><br><br> **ORIGINAL NOTICE** |

**TO THE ABOVE-NAMED DEFENDANT:**

You are notified that a petition has been filed in the office of the clerk of this court naming you as the defendant in this action.  A copy of the petition (and any documents filed with it) is attached to this notice. The name and address of the attorneys for the plaintiff are Dennis L. Puckett and Diana S. Machir, 6601 Westown Pkwy STE 200, West Des Moines, Iowa  50266-7733. Their phone number is 515-244-3500; facsimile number is 515-244-3599.

You are further notified that the above case has been filed in a county that utilizes electronic filing.  Unless, within 20 days after service of this original notice upon you, you serve, and within a reasonable time thereafter file a motion or answer, in the Iowa District Court for Appanoose County, at the courthouse in Centerville, Iowa, judgment by default will be rendered against you for the relief demanded in the petition.  Please see Iowa Court Rules Chapter 16 for information on electronic filing and Iowa Court Rules Chapter 16, division VI regarding the protection of personal information in court filings.

If you require the assistance of auxiliary aids or services to participate in court because of a disability, immediately call your district ADA coordinator at 641-684-6502.  (If you are hearing impaired, call Relay Iowa TTY at 1-800-735-2942)

**IMPORTANT:** YOU ARE ADVISED TO SEEK LEGAL ADVICE AT ONCE TO PROTECT YOUR INTERESTS

E-FILED  2024 DEC 04 10:38 AM APPANOOSE - CLERK OF DISTRICT COURT

# Iowa Judicial Branch

| | |
|---|---|
| *Case No.* | **CVEQ005881** |
| *County* | **Appanoose** |

*Case Title*    NE MISSOURI ELECTRIC POWER COOP V. ITC MIDWEST LLC

You must file your Appearance and Answer on the Iowa Judicial Branch eFile System, unless the attached Petition and Original Notice contains a hearing date for your appearance, or unless the court has excused you from filing electronically (*see* Iowa Court Rule 16.302).

Register for the eFile System at www.iowacourts.state.ia.us/Efile to file and view documents in your case and to receive notices from the court.

For general rules and information on electronic filing, refer to the Iowa Rules of Electronic Procedure in chapter 16 of the Iowa Court Rules at www.legis.iowa.gov/docs/ACO/CourtRulesChapter/16.pdf.

Court filings are public documents and may contain personal information that should always be kept confidential. For the rules on protecting personal information, refer to Division VI of chapter 16 of the Iowa Court Rules and to the Iowa Judicial Branch website at www.iowacourts.gov/for-the-public/representing-yourself/protect-personal-information/.

| |
|---|
| *Scheduled Hearing:* |
| |

If you need assistance to participate in court due to a disability, call the disability access coordinator at **(641) 684-6502** . Persons who are hearing or speech impaired may call Relay Iowa TTY (1-800-735-2942). For more information, see www.iowacourts.gov/for-the-public/ada/. **Disability access coordinators cannot provide legal advice.**

*Date Issued* **12/04/2024 10:38:16 AM**



*District Clerk of Court or/by Clerk's Designee of* Appanoose        *County*
**/s/ Jazmine Vestal**

**Exhibit 1, page 2**

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR APPANOOSE COUNTY

| | |
|---|---|
| NORTHEAST MISSOURI ELECTRIC POWER COOPERATIVE, <br><br> Plaintiff, <br><br> vs. <br><br><br> ITC MIDWEST, LLC, <br><br> Defendant. | CASE NO. _____ <br><br> **PETITION FOR TEMPORARY AND PERMANENT INJUNCTIVE RELIEF** |

**COMES NOW** the Plaintiff, Northeast Missouri Electric Power Cooperative (Northeast Power), through its undersigned counsel, and hereby submits this Petition for Temporary and Permanent Injunctive Relief, stating in support thereof as follow:

**PARTIES AND JURISDICTION**

1.      Northeast Power is a not-for-profit transmission electric utility owned by eight member-distribution cooperatives in southeast Iowa and northeast Missouri.

2.      Northeast Power was formed under the laws of the State of Missouri and is authorized to transact business in the State of Iowa.  Northeast Power's headquarters is in Palmyra, Missouri.

3.      ITC Midwest LLC is a Michigan limited liability company with its headquarters in Cedar Rapids, Iowa.  ITC Midwest is a transmission company and engages in the development, ownership, and operation of facilities for the

transmission of electric energy service in Iowa, Minnesota, Illinois, and Missouri with approximately 6,700 circuit miles of transmission lines.

4.     The underlying matter involves ITC Midwest's existing facilities or infrastructure connected to Northeast Power's Honey Creek and Moravia substations and affects Northeast Power's electric transmission service to Chariton Valley Electric Cooperative, Inc. (Chariton Valley).

5.     Chariton Valley distributes electric service to its member-consumers in its assigned electric service area, which includes portions of Appanoose, Davis, Lucas, Marion, Monroe, Wappello, and Wayne Counties in south central Iowa.  The Honey Creek and Moravia substations are primarily used to serve member-consumers in the northern part of Appanoose County, including rural residents around Moravia, Iowa and Rathbun Lake, which includes Honey Creek State Park.  They also serve Alliant Energy customers in the Moravia area.  Thus, the facilities or infrastructure is critical to those member-consumers.

6.     This Court has subject-matter jurisdiction over this action.

**BACKGROUND**

**A.  Utility Organizations.**

7.     Northeast Power is part of a three-tiered not-for-profit cooperative system.

a.     The member-distribution cooperatives are the top tier providing electric service directly to member-owners, which includes businesses, farms, and households.  Distribution cooperatives take on

2

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

many different responsibilities, including installation and maintenance of power lines from substations to members' homes and businesses.

b.    Northeast Power is part of the second-level tier and responsible for transmission services and delivery of wholesale power to the member-distribution cooperatives it serves, including Chariton Valley.    Their responsibilities include, in part, the construction, operation, and maintenance of electric transmission lines and substations.

c.    The last tier is Associated Electric Cooperative, Inc. of Springfield, Missouri.    It is responsible for generation and power procurement for its members, including Northeast Power.

8.    The Iowa Utilities Commission (IUC) regulates the rates and services of certain utilities and specific infrastructure related to pipelines and electric transmission lines in the State of Iowa.

9.    The Federal Energy Regulatory Commission (FERC) is an independent federal agency that regulates, among other things, the transmission and wholesale of electricity in interstate commerce. This includes the rates, terms, and conditions pursuant to which ITC Midwest provides electric power transmission service.

10.    Midcontinent Independent System Operator (MISO) is a not-for-profit organization that manages the electric transmission system or grid for central United States comprised of portions of 15 states and the Canadian province of Manitoba.  MISO facilitates the buying and selling of electricity in

3

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

its region and partners with its stakeholders to plan the future grid.  MISO is one of seven independent system operators (ISO) or regional transmission operators (RTO) under FERC's jurisdiction.

**B.  Underlying Agreements & Actions.**

11.    Northeast Power is owned by its eight local member-distribution cooperatives.    It constructs, maintains, and operates 1,004 miles of transmission lines and 118 combined distribution substations, switch, and transmission stations.  Northeast Power, through its member systems, serves more than 56,000 homes, farms, and businesses.

12.    In 2012, Northeast Power executed an Amended and Restated Interconnection and Transmission Service Agreement (ITSA) with ITC Midwest, along with MISO, and Interstate Power and Light Company (IPL) on transmission service delivery points or the service received at those points.  In part, the ITSA included delivery point and service provisions related to the Moravia and Honey Creek substations.

Northeast Power's franchise petition with IUC.

13.    On July 9, 2020, Northeast Power filed a petition with the IUC for a franchise to construct, operate, and maintain a new proposed 8.36-mile, 69 kV voltage electric transmission line.   The proposed line would provide electrical interconnection service for its Honey Creek and Moravia substations.

    a.    Those substations along with the transmission lines, and all related interconnections are instrumental for the delivery of electric service to the surrounding areas.

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

b.    Iowa Code chapter 478 sets forth certain requirements that must be established before the IUC will grant a franchise for the construction of a new line.

c.    On November 1, 2021, ITC Midwest filed an objection to the petition asserting in part that the service to be provided by the line was already provided by an existing ITC Midwest line.

d.    As Northeast Power asserted in its response, the new line was an investment to ensure reliability of electric service; support further growth in the area; and would result in savings for Northeast Power's member-customers.

e.    After determining that Northeast Power's proposed line met Iowa Code section 478.4 requirements, IUC granted the franchise. *See In re: Northeast Missouri Electric Power Cooperative*, Docket No. E-22441 (Board Order 8/12/2022).

14.    Weeks after the IUC order, on September 1, 2022, ITC Midwest provided Northeast Power with the required two-year notice of its intent to terminate the ITSA with Northeast Power in 2024.

ITC Midwest's first petition filed with FERC.

15.    During the same period that the IUC case had been pending, ITC Midwest filed a petition for a declaratory order with FERC on November 2, 2021. ITC Midwest requested that FERC determine ITC Midwest was not required to provide "wheeling" service to Northeast Power and that Northeast Power could not unilaterally modify certain transmission service delivery points

5

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

or the service received at those points pursuant to the ITSA. *See ITC Midwest LLC*, 178 FERC ¶61,150, Docket No. EL-9-000 (2/28/2022)("February 2022 order").

16.    In its February 2022 order, FERC denied ITC Midwest's petition in part after concluding the ITSA did not prohibit Northeast Power's proposed modifications to the Honey Creek or Moravia delivery points.

    a.    Additionally, FERC concluded the ITSA obligated ITC Midwest to provide wheeling service to Northeast Power up to 30,000 kW and did not require Northeast Power to take a minimum amount of service.

    b.    However, FERC clarified that its Commission Order No. 888 did not require ITC Midwest to provide backup supply service. In that order, the Commission had expressly held that

transmission providers are not compelled to provide backup supply service, which is generally defined as 'electric generating capacity and energy that is provided to the transmission customer as needed: (1) to replace the loss of its generation sources; and (2) to cover that portion of the customer's load that exceeds its generation supply more than a short time.

*Id.* at 5-6 (quoting Order No. 888). For this Court's clarification, "backup service" in the FERC order refers to circumstances concerning loss of generation, not emergency transmission.

## C.  Current Agreements and Negotiations.

17.    After the IUC issued a franchise for Northeast Power's electrical interconnection service for its Honey Creek and Moravia substations, in or

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

about April 2024, Northeast Power contacted relevant stakeholders, including ITC Midwest, to plan the required outage and sequencing for its new line tie into Northeast Power's Moravia substation.

    a.    At the current Moravia substation, the location of ITC Midwest lines requires ITC's coordination for outages and the construction of the tie line requested by Northeast Power. *See* Exhibit 2, "Existing Moravia Sub."

    b.    Northeast Power proposes the installation of a line switch that would tie a section of a proposed Northeast Power line to its new line that was approved and a franchise issued by the IUC. *See* Exhibit 3, "Proposed Moravia Sub," (red line reflecting franchised line; dashes reflecting proposed line); and Exhibit 4, "Moravia Sub Conceptual."

18.    To date, ITC Midwest refuses to coordinate the outage and the related required operation of its facilities with Northeast Power for Northeast Power to achieve the interconnections necessary to initiate transmission service over the new line tie for the Moravia substation.

19.    At or around the same period this spring, Northeast Power attempted to negotiate a new ITSA contract with ITC Midwest to continue the same interconnections and points of delivery between them.

20.    To date, ITC Midwest has refused to include provisions for interconnection facilities to remain at Honey Creek and Moravia substations, despite Northeast Power's offer to pay the costs associated with such interconnection facilities. ITC Midwest is, however, willing to continue to

7

provide facilities for the Numa, Melrose, Harvard, Weller, Perlee, Coppock, and Spring Grove substations.

21.    Specifically, Northeast Power seeks an order requiring the temporary disconnection and reconnection, at Northeast Power's expense, of the ITC Midwest interconnection facilities at the Honey Creek and Moravia substations to allow Northeast Power to install the facilities needed for its new tie line.  Absent the reconnection of those interconnection facilities, Northeast Power would be unable to obtain emergency transmission service needed to ensure reliable service consistent with good utility practice.  *See* Exhibits 2-4; Exhibit 5, "Honey Creek Tap."

22.    The ISTA expired at the beginning of September.  ITC Midwest and Northeast Power could not agree on a replacement contract due to ITC Midwest's failure to include the Moravia and Honey Creek substation connections that would be used by Northeast Power in the case of emergencies.

23.    As a result of the parties' failure to agree, on November 1, 2024, ITC Midwest filed (with FERC) a Distribution-Transmission Interconnection Agreement (DTIA) between it and Northeast Power.  The DTIA would replace the ISTA.  However, the DTIA remains unexecuted due to ITC Midwest's failure to include interconnection and facilities associated with the Moravia and Honey Creek substations.  *See* Exhibit 6, ITC Midwest filing, FERC ER25-334.

    a.    ITC Midwest has requested FERC to approve the DTIA and Northeast Power anticipates FERC's eventual resolution of the outstanding issues.

8

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

b.    On November 22, 2024, Northeast Power filed its Answer to ITC Midwest's DTIA filing.  *See* Exhibit 7, Northeast Missouri Electric Power Cooperative' Answer in FERC No. ER25-334.

c.    While the FERC proceeding is pending in this interim period, the issues surrounding electric service to the Moravia and Honey Creek community neighborhoods remain and may be affected by equipment coordination, inaction, or removal.

d.    FERC does not have the authority to order injunctive relief, i.e., a temporary stay while the FERC case is pending.

24.    To ensure that households, businesses, and farmers located around Moravia and Rathbun Lake receive reliable electric service, (1) ITC Midwest must coordinate the Moravia outage and interconnection with Northeast Power; and (2) the ITC Midwest facilities must remain in place, subject to appropriate compensation by Northeast Power, to ensure emergency "wheeling" of electric service when needed.

The coordination for (1) requires:

a.    Coordination of an outage and work to reconnect interconnection facilities with ITC Midwest allowing Northeast Power to tie its new line that has been authorized and franchised in the IUC proceeding to its own substation and then allowing reconnection of the ITC Midwest facilities at the Northeast Power switch pole.  The result will allow Northeast power to utilize its new line authorized by the IUC and preserve the interconnection between Northeast Power's system and ITC Midwest's system that can be

9

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

utilized in the event the FERC proceeding results in a favorable decision for Northeast Power.

b.   Alternatively, while less favorable than above, coordination of an outage to allow Northeast Power to tie its new line that has been franchised in the IUC proceeding to its substation, and allowing ITC Midwest to disconnect but not remove its facilities, preserving the ability to interconnect in the future at the Northeast Power switch pole in the event the FERC proceeding results in a favorable decision for Northeast Power. 25. There are no other facilities or quick infrastructure alternative for Northeast Power to obtain this same emergency transmission wheeling service.

**COUNT I**
**TEMPORARY AND PERMANENT INJUNCTION**

26.   Northeast Power re-alleges and incorporates by reference all prior paragraphs of this Petition.

27.   The maintenance of ITC Midwest's equipment to continuously provide emergency transmission wheeling service to Northeast Power is required to provide reliable electrical service to the member-customers served by Chariton Valley and the Alliant customers in the Moravia area.  It is critical these members of the public have electric service during periods of severe weather and planned maintenance.  Thus, the public interest weighs in favor of a grant of injunctive relief. *See* Exhibit 2, Existing Moravia Sub for location of an electrical feeder line that transmits electricity for Alliant customers.

10

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

28.    There are no other means for Northeast Power to obtain emergency transmission wheeling service from another utility or obtain the required replacement infrastructure or facilities should ITC Midwest be allowed to discontinue and remove its interconnection facilities.

29.    Northeast Power attempted to resolve all outstanding issues through negotiations with ITC Midwest.  With the filing of the DTIA, the issue is now before FERC for resolution.  During this interim period, ITC Midwest has indicated that it will remove its facilities.

30.    Absent injunctive relief, Northeast Power has no adequate remedy at law.

31.    Currently, ITC Midwest has all the equipment and facilities in place necessary to provide emergency transmission wheeling service to Northeast Power's Moravia and Honey Creek substations if needed.   ITC Midwest utilizes this equipment and facilities to transmit electric service to other utilities and Northeast Power has conveyed its willingness to pay for any expenses associated with those facilities needed to ensure Northeast Power can obtain emergency wheeling service if needed.

32.    By requiring ITC Midwest to keep its facilities in place until the matter is resolved by FERC, any harm resulting to ITC Midwest is outweighed by the irreparable harm to Chariton Valley member-consumers and Alliant customers in the Moravia area should they be subjected to an extended outage of electric service, especially during severe weather or planned maintenance periods.

E-FILED  2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

33.     Northeast Power is likely to succeed on the merits of its claims and the balance of harms favors issuing a temporary and permanent injunction.

34.     Pursuant to Iowa Rule of Civil Procedure 1.1502(2), Northeast Power submits the Affidavit of Douglas Aeilts, its CEO and General Manager, in support of its request for a temporary and permanent injunction.  The attached Affidavit is marked as Exhibit 1.

35.     No petition for the same relief or any part thereof has previously been presented to and refused by any court or tribunal.

36.     Northeast Power requests an expedited hearing on this matter and that the Court waives any bond requirement for any injunction.

WHEREFORE, Plaintiff Northeast Missouri Electric Power Cooperative, respectfully requests the Court immediately enter a temporary and ultimately a permanent injunction in favor of Northeast Missouri Electric Power Cooperative under any one or all grounds specified for requested relief, including, but not limited to ITC Midwest maintaining its equipment and facilities necessary for the Moravia and Honey Creek substations and to coordinate its equipment at the Moravia substation for Northeast Power to perform minor modifications; award attorney's fees, cost, and expenses against Respondent ITC Midwest LLC, and award such other further relief as the Court deems just and appropriate under the circumstances.

E-FILED  2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

Respectfully submitted,

By:    */s/ Dennis L. Puckett*
  Dennis L. Puckett ΛT0006476
  Diana S. Machir AT0009824
  Sullivan & Ward, P.C.
  6601 Westown Parkway, Suite 200
  West Des Moines, Iowa 50266
  Tel. (515) 244-3500
  Fax (515) 244-3599
  E-mail: Dpuckett@sullivan-ward.com
      Dmachir@sullivan-ward.com

**ATTORNEYS FOR PETITIONER**

*Filed electronically via EDMS.*

13

**Exhibit 1, page 15**

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

EXHIBIT 1

### IN THE IOWA DISTRICT COURT FOR APPANOOSE COUNTY

| | |
|---|---|
| NORTHEAST MISSOURI ELECTRIC POWER COOPERATIVE, | CASE NO. _____ |
| Plaintiff, | |
| vs. | **AFFIDAVIT OF DOUGLAS H. AEILTS** |
| ITC MIDWEST, LLC, | |
| Defendant. | |

STATE OF MISSOURI   )
                    )ss:
COUNTY OF MARION   )

The undersigned, being first duly sworn upon oath, deposes and states as follows:

1. I, Douglas H. Aeilts, CEO and General Manager for Northeast Missouri Power Electric Cooperative, have personal knowledge of the statements set forth in this Affidavit and know of my own personal knowledge and belief that the facts set forth herein are true and correct.

2. Northeast Power is part of a three-tier not-for-profit cooperative. As part of the second tier, Northeast Power is responsible for the transmission and delivery of wholesale power to the member-distribution cooperatives it serves, including Chariton Valley Electric Cooperative, Inc.

3. Chariton Valley distributes electric service to its member-consumers in its assigned electric service area, which includes portions of Appanoose, Davis,

1

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

Lucas, Marion, Monroe, Wappello, and Wayne Counties in south central Iowa. These member-consumers are households, businesses, and farms.

4.    Northeast Power's Honey Creek and Moravia substations are primarily used to serve Chariton Valley's member-consumers in the northern part of Appanoose county, including rural residents around Moravia, Rathbun Lake, and Honey Creek State Park and Alliant Energy customers in the Moravia area.

5.    This last spring, Northeast Power contacted stakeholders, including ITC Midwest LLC, to coordinate the outage and sequencing for its new line tie into Northeast Power's Moravia substation.

6.    ITC Midwest refused to coordinate the outage and the related coordination of its facilities for Northeast Power to accomplish the new line tie. Rather, ITC Midwest indicated its intent to remove its existing facilities.

7.    Additionally, during the spring, Northeast Power attempted to negotiate a new contract with ITC Midwest to continue the same interconnections and points of delivery between them as previously contracted. Their prior 2012 contract, "Amended and Restated Interconnection and Transmission Service Agreement (ITSA)," contained those same terms and provisions.

8.    In their negotiations, ITC Midwest refused to include provisions for interconnection facilities to remain at Honey Creek and Moravia although ITC Midwest is willing to continue to provide facilities for Numa, Melrose, Harvard, Weller, Perlee, Coppock, and Spring Grove.

2

**Exhibit 1, page 17**

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

9.     The Honey Creek and Moravia substations, along with the transmission lines, and all related interconnections, are instrumental to the delivery of electric service to the surrounding areas.

10.     The ISTA expired at the beginning of September and a new contract has not been executed due to ITC Midwest's failure to include the Honey Creek and Moravia substation connections that would be used by Northeast Power in case of emergencies.

11.     There are no other facilities, available infrastructure, or means through which Northeast Power can obtain emergency "wheeling" of electric service when needed in an emergency.

12.     ITC Midwest's wheeling service is intermediary.     The actual transmission of electric service comes from the Midcontinent Independent System Operator (MISO), a not-for-profit that manages the electric transmission system or grid, the buying and selling of electricity, for central United States.

13.     Without ITC Midwest's emergency wheeling of electric service, the Chariton Valley member-consumers in the Moravia, Rathbun Lake, and Honey Creek areas risk extended periods without electric service, including periods during severe weather and planned maintenance.

14.     ITC Midwest filed our unexecuted contract with the Federal Energy Regulatory Commission (FERC) to resolve the underlying issue in dispute.  I have been advised that FERC does not have the power to issue injunctive relief that would prevent ITC Midwest from removing its facilities.

**Exhibit 1, page 18**

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

15.    Because there are no alternatives to ITC Midwest's facilities to serve the Moravia substation communities, the facilities are needed to stay in place during the pendency of any FERC proceeding or till the parties are able to reach mutual agreement on a new contract.

16.    There is no economic burden to ITC Midwest if the facilities stay; Northeast Power has indicated its willingness to pay the costs of the facilities' maintenance, operation and future replacement.


FURTHER AFFIANT SAYETH NAUGHT.

DATED at Marion County, Missouri, this 25th day of November, 2024.


Douglas H. Aeilts


Subscribed and sworn to before me, a Notary Public in and for the State of Missouri on the 25th day of November 2024.


Notary Public in and for said State

My commission expires: May 16, 2027

RACHEL A BEMIS
NOTARY PUBLIC, NOTARY SEAL
STATE OF MISSOURI
MARION COUNTY
COMMISSION # 19407350
MY COMMISSION EXPIRES: 5/16/2027

4

**Exhibit 1, page 19**



EXHIBIT 2

E-FILED  2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

Existing Moravia Sub

LINE SWITCH (2)

ALLIANT DISTRIBUTION FED BY MORAVIA SUB

EXISTING ITC

SUB SWITCH

EXISTING NORTHEAST POWER

NORTHEAST POWER MORAVIA SUBSTATION

NORTHEAST POWER NEW LINE

Exhibit 1, page 20

EXHIBIT 3

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

Proposed Moravia Sub

LINE SWITCH (2)

EXISTING ITC

EXISTING ITC LINE REDUCED LENGTH

PROPOSED NORTHEAST POWER NEW LINE

ALLIANT DISTRIBUTION FED BY MORAVIA SUB

PROPOSED NORTHEAST POWER LINE SWITCH

PROPOSED NORTHEAST POWER

SUB SWITCH

EXISTING NORTHEAST POWER

NORTHEAST POWER MORAVIA SUBSTATION

NORTHEAST POWER NEW LINE

Exhibit 1, page 21

EXHIBIT 4

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

# Moravia Sub Conceptual



PROPOSED NEW NORTHEAST POWER LINE

PROPOSED NEW NORTHEAST POWER SWITCH POLE

EXISTING ITC SWITCH POLE

EXISTING ITC LINE REDUCED LENGTH

PROPOSED NEW NORTHEAST POWER LINE

NEW NORTHEAST POWER LINE

**Exhibit 1, page 22**

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

EXHIBIT 5

Honey Creek Tap



EXISTING HONEY CREEK TAP

LINE SWITCH (3)

DETAIL



EXISTING ITC TRANSMISSION LINE

SEE DETAIL

NEW HONEY CREEK TAP

NEW NORTHEAST POWER TRANSMISSION LINE

EXISTING NORTHEAST POWER TRANSMISSION LINE

MORAVIA

HONEY CREEK SUB

**Exhibit 1, page 23**

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

**EXHIBIT 6**



November 1, 2024

<u>VIA ETARIFF FILING</u>

Hon. Debbie-Anne A. Reese, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

      **Re:**    **ITC Midwest LLC**
                  **Docket No. ER25-__-000**
                  **ITC-NEP Distribution-Transmission Interconnection Agreement**

Dear Secretary Reese,

      Pursuant to section 205 of the Federal Power Act[1] and Part 35 of the regulations of the Federal Energy Regulatory Commission ("Commission"),[2] ITC Midwest LLC ("ITC Midwest") respectfully submits for filing a Distribution-Transmission Interconnection Agreement ("DTIA") between ITC Midwest and the Northeast Missouri Electric Power Cooperative ("NEP") (together, the "Parties"). The DTIA provides the terms pursuant to which NEP will interconnect its distribution system with the ITC Midwest electric transmission system. This agreement is being submitted without NEP's execution due to certain limited disputed provisions detailed below.

      ITC Midwest respectfully requests that the Commission accept the DTIA for filing with an effective date of January 1, 2025.

**I.**      **Background**

      ITC Midwest is a wholly-owned subsidiary of ITC Holdings Corp. ITC Holdings Corp. in turn is majority owned by Fortis Inc. and minority owned by GIC Private Limited. ITC Midwest is an independent transmission company operating primarily in Iowa, with portions of its system in Wisconsin, Minnesota, Illinois, and Missouri. ITC Midwest owns more than 6,600 miles of transmission lines and 208 electric transmission substations in Iowa, Minnesota, Illinois, and Missouri and maintains operating locations at Dubuque, Iowa City, and Perry, Iowa and Albert Lea and Lakefield, Minnesota. ITC Midwest is a transmission-owning member of the Midcontinent Independent System Operator, Inc.

      NEP is a generation and transmission cooperative comprised of eight Member Distribution Cooperatives with five located in northeast Missouri and three in southeast Iowa.

---

[1]      16 U.S.C. § 824d (2018).
[2]      18 C.F.R. Part 35 (2024).

**I T C   H O L D I N G S   C O R P .**   27175 Energy Way • Novi, MI 48377
phone: 248.946.3000 • www.itc-holdings.com
**Exhibit 1, page 24**

Document Access... 
E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

NEP and ITC are currently parties to an Amended and Restated Interconnection and Transmission Service Agreement executed by NEP, ITC Midwest, Midcontinent Independent Transmission System Operator, Inc. ("MISO"), and Interstate Power and Light Company ("IPL"), entered into January 11, 2012 ("ITSA").[3] The ITSA is a Commission-jurisdictional agreement and is published as part of MISO's Open Access Transmission, Energy and Operating Reserve Markets Tariff ("MISO Tariff").[4] The ITSA is a Grandfathered Agreement under the MISO Tariff and requires ITC Midwest to provide transmission services to NEP in the form of wheeling service to nine specifically identified delivery points at a total maximum capacity demand of up to 30,000 kW.

On September 1, 2022, ITC Midwest provided a certified letter to the parties to the ITSA stating its intent to unilaterally terminate the agreement. The termination provisions of the ITSA provide that any party may unilaterally terminate the agreement provided they give at least two years' prior notice of the proposed termination date. A copy of the termination letter is included as Attachment A to this filing. It included a proposed termination effective date of September 1, 2024. However, on August 30, 2024, prior to the original termination effective date, ITC Midwest stated in writing to NEP that the actual requested effective date of the ITSA termination, to be included in a later tariff record cancellation filing of the ITSA by ITC Midwest and MISO for Commission acceptance, would align with the requested effective date of the replacement DTIA. Thus, it was ITC Midwest's express intent, as of August 30, 2024, that the actual termination date of the ITSA be suspended pending the finalization and submission of a DTIA, and that both would have the same effective date.

In its September 1, 2022 ITSA termination notification, ITC Midwest also informed the parties of its intent to, in accordance with good utility practice, initiate a new required interconnection agreement (Distribution-to-Transmission) to continue operation of interconnection points between ITC Midwest and NEP prior to termination of the ITSA. ITC Midwest and NEP have attempted to negotiate a mutually agreeable replacement agreement but have reached an impasse on a limited set of provisions as described in detail below. As such, and to accommodate the orderly termination of the ITSA which will be submitted by MISO on ITC Midwest's behalf, ITC Midwest is submitting the DTIA described herein without its execution by NEP. ITC has communicated to MISO its request that the effective date of the cancellation of the ITSA be consistent with the DTIA's effective date – *i.e.*, January 1, 2025, and is working with MISO to implement that cancellation.

## II.    Description of the DTIA

The DTIA documents existing interconnection practices including: (1) describing the general facilities, and ownership thereof, that will be used at the interconnection site in establishing the Connection Facilities (as described in Section 1 of the DTIA), respective

---

[3]      MISO is identified in the ITSA by its prior name "Midwest Independent System Operator, Inc."
[4]      MISO – Midwest ISO Agreements, SA 2278, ITC Midwest-NEMO (30.0.0), https://etariff.ferc.gov/TariffBrowser.aspx?tid=1446.

ownership of facilities, obligations and rights with respect to procurement, installation, operation and maintenance of such facilities; and (2) describing other procedures that are necessary to maintain safety, reliability and integrity on ITC Midwest's and NEP's systems as a result of establishing the Connection Facilities. The DTIA will be effective upon acceptance by FERC as of the date FERC deems it effective.[5]

Section 1.1.1 of the DTIA identifies, through the attached Exhibits A1 and A2, the Connection Facilities to be governed by the DTIA.[6] Each Party shall bear the cost of maintaining, operating, repairing, or replacing its Connection Facilities unless otherwise specified in the DTIA.[7] The costs of any additions or modifications to NEP's Connection Facilities will be borne by NEP.[8] The cost of any additions or modifications to ITC Midwest's Connection Facilities shall be recovered through the MISO Tariff.[9] Any modification of Connection Facilities that directly impacts the other Party such that modifications are required to the other Party's Connection Facilities, including modifications to operations of the Connection Facilities, shall only be allowed if mutually agreed to by the Parties.[10] Section 1.4 of the DTIA describes the connection point and point of change in facility ownership. Section 1.5 allows NEP to request, at its own cost, the relocation of ITC Midwest-owned equipment. Section 1.6 provides the terms at which additional facilities that are not Connection Facilities may be added in the future and specifies that the addition of new Points of Interconnection or Connection Facilities shall only be allowed if mutually agreed to by the Parties. Invoices to NEP shall be due within thirty (30) days, and any invoice payment not made on or before the due date will bear interest at an annual percentage rate equal to the lesser of (a) the prime rate published by the Wall Street Journal on the due date, plus two percent (2%), or (b) the highest rate permitted by law.[11]

Section 2 sets out the terms for the design and construction of the Connection Facilities. Sections 3.1 and 3.2 provide the Parties' respective operation and maintenance obligations for the Connection Facilities. Sections 3.3-3.5 address the Parties' rights and responsibilities with regard to insurance, taxes and environmental safety. Section 5 sets out the service conditions for the Connection Facilities including with respect to reactive control, continuity of service, transmission service, access rights, and North American Electric Reliability Corporation responsibilities. Section 11 provides that at such time as the interconnection is no longer required, the retirement of the facilities shall be the responsibility of the party owning such facilities, and that the retirement and removal of facilities shall be done as expeditiously as possible. Sections 4, 6 through 10, and 12 through 16 provide for other routine contract terms generally included in agreements of this type.

---

[5]    DTIA § 10.
[6]    *Id.* § 1.1.1.
[7]    *Id.* § 1.1.2.
[8]    *Id.* § 1.1.3.2.
[9]    *Id.* § 1.1.3.3.
[10]   *Id.* § 1.1.3.
[11]   *Id.* at § 1.7.3.

### III.    Disputed Provisions

Following extended negotiations, ITC Midwest provided NEP with an executable DTIA to replace the ITSA.  ITC requested that NEP either (1) execute the agreement; or (2) if it refused to execute the agreement, identify the specific provisions or excluded provisions that it was unable to accept.  ITC Midwest further informed NEP of its intent to file the DTIA on an unexecuted basis if NEP was unwilling to agree to the DTIA as proposed.

In response to ITC Midwest's correspondence, NEP informed ITC Midwest that it was unwilling to execute the DTIA submitted in this filing.  NEP stated that it disagreed with the inclusion or exclusion of the following provisions:

- The inclusion of the provision in Section 1.1.3 that "[a]ny modification of Connection Facilities that directly impacts the other Party such that modifications are required to the other Party's Connection Facilities, including modifications to operations of the Connection Facilities, shall only be allowed if mutually agreed to by the Parties."[12]
- The inclusion of the provision in Section 1.6 that "[t]he addition of new Points of Interconnection or Connection Facilities shall only be allowed if mutually agreed to by the Parties."[13]
- The exclusion of provisions for interconnection facilities to remain at Honey Creek and Moravia, interconnection points previously included under the ITSA.

These provisions are necessary to ensure just and reasonable service under the immediate circumstances.  With respect to the exclusion of Moravia and Honey Creek interconnection points, NEP has elected to obtain alternative primary service at these locations.  ITC Midwest has made its position with respect to this alternative primary service clear to NEP, including in public submissions during NEP's Iowa Utilities Board ("IUB") proceeding to receive a franchise to construct and own the alternative service it now takes.[14]  In other words, NEP wants ITC Midwest to maintain its interconnections with the NEP distribution system at Honey Creek and Moravia—and to incur ongoing costs to maintain that reliability—to provide NEP a backup supply service option at these points, without paying for service.  ITC Midwest is not willing to allow the ITC Midwest transmission system to be utilized as a free back-up to provide continued reliability to loads that previously paid for use of the ITC Midwest transmission system and the reliability that it provides. That would be unfair to all of ITC Midwest's other customers—it would shift the responsibility for cost recovery for the facilities used to serve NEP to ITC Midwest's other customers, resulting in a subsidy to NEP.

Notably, in the same IUB proceeding, ITC Midwest also stated that it likely would seek to terminate the ITSA if NEP sought to obtain alternative primary service at an ITC Midwest-

---

[12]    *Id.* § 1.1.3.
[13]    *Id.* § 1.6.
[14]    *In Re: Northeast Missouri Electric Power Cooperative*, Reply Brief of ITC Midwest, IUB Docket No. E-22441 (June 1, 2022).

NEP interconnection point, which it now has.[15]  ITC Midwest explained that such termination would require it to move the loads that take service from the ITC Midwest transmission system under that ITSA to a Distribution – Transmission Interconnection Agreement, and that a "normally-open transmission interconnection" would not be allowed by ITC Midwest.[16]  ITC Midwest's exclusion of the Moravia and Honey Creek points of interconnection from the DTIA is the exact outcome ITC Midwest informed NEP would come to pass over two years ago if it chose to establish alternative primary service at ITC Midwest-NEP interconnection points.

Regardless of this reasonable basis for excluding the Moravia and Honey Creek locations from the Points of Interconnection covered by the DTIA, ITC Midwest has no obligation to provide service to these locations following termination of the ITSA.  As the Commission found in a prior dispute regarding the ITSA, "Order No. 888 does not require ITC Midwest to provide backup supply service to [NEP]."[17]  More specifically, in Order No. 888 the Commission found that a transmission provider "has no obligation to furnish replacement power on a long-term basis if the customer loses its source of supply" and that "it is inappropriate to require the transmission provider to assume significant generation responsibilities as we functionally unbundle transmission from generation."[18]  While the Commission nevertheless determined that ITC Midwest was contractually bound to provide certain wheeling services pursuant to the ITSA, the DTIA is a new, separate agreement that is intended to supersede the terminating ITSA and that makes clear that no transmission service is provided under the agreement.[19]  Accordingly, the exclusion of the Moravia and Honey Creek distribution interconnections is just and reasonable and should be accepted by the Commission.

Finally, the disputed provisions in DTIA Sections 1.1.3 and 1.6 are necessary to prevent recurrences of the unfair outcome created by NEP's establishment of alternative primary service to Moravia and Honey Creek described above.  The provisions are reasonable because they simply provide that the parties must mutually agree before adding new Points of Interconnection or Connection Facilities or making modifications to Connection Facilities that directly impact the other Party such that modifications (including to operations) are required to the other Party's Connection Facilities.  This protects both parties equally and provides increased certainty to both parties as they go forward under the DTIA.  Moreover, if there were a dispute as to these terms as applied, the DTIA provides that the parties agree to use the dispute resolution procedures of the MISO Tariff, as they may be amended from time to time, for all disputes, and modified as necessary to be applicable to disputes outside of the MISO's Tariff.[20]  These provisions therefore are just and reasonable and should be accepted by the Commission.

---

[15]     *Id.* at 4-5.
[16]     *Id.* at 4.
[17]     *ITC Midwest LLC*, 178 FERC ¶ 61,150, at P 37 (2022).
[18]     Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.; Recovery of Stranded Costs by Pub. Utils. & Transmitting Utils., Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,710-11 (1996) (cross-referenced at 75 FERC ¶ 61,080) (subsequent history omitted).
[19]     DTIA § 5.3.
[20]     *Id.* § 15.

## IV.    Additional Information

### A.  Proposed Effective Date and Request for Waiver

ITC Midwest respectfully requests that the Commission accept the DTIA effective January 1, 2025.  This filing substantially complies with the requirements of Part 35 applicable to filings of this kind.  To the extent necessary, ITC Midwest respectfully requests waiver of any applicable requirement that is found not to be completely satisfied by this filing.

### B.  Correspondence

Communications regarding this filing should be sent to the following individuals.

| | |
|---|---|
| Kyle Hall Henne<br>ITC Holdings Corp.<br>601 13th Street N.W.<br>Suite 710S<br>Washington, DC 20005<br>(804) 615-5471<br>khenne@itctransco.com | Russell Kooistra<br>Antonia Douglas<br>Troutman Pepper Hamilton Sanders LLP<br>401 9th Street, NW, Suite 1000<br>Washington, DC 20004<br>(202) 274-2872<br>russell.kooistra@troutman.com<br>antonia.douglas@troutman.com |

### C.  Documents Submitted in This Filing

The documents being submitted with this filing include this transmittal letter and a clean copy of the Agreement.

Attachment A – ITC Midwest Notice of Termination of ITSA and Dusky Terry Correspondence; and

Attachment B – Clean Copy of the Public Version of the Agreement.

Document Accesson:  E-FILED  2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

**V.      Conclusion**

For the reasons discussed herein, ITC Midwest respectfully requests that the Commission accept the DTIA effective January 1, 2025.

Respectfully Submitted,

*/s/ Kyle Hall Henne*
Kyle Hall Henne
ITC Holdings Corp.
601 13th Street N.W.
Suite 710S
Washington, DC 20005
(804) 615-5471
khenne@itctransco.com

*Counsel for ITC Midwest LLC*

Document Accession... E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

**Attachment A**
**ITSA Notice of Termination and Dusky Terry Correspondence**

DocuSign Envelope ID: 6D848889-0832-4440-852B-A37D13B447FA
Document Acc Case 4:24-cv-00432-SHL-SBJ Document 1-1 Filed 12/09/24 Page 32 of 63

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT



CERTIFIED MAIL
RETURN RECEIPT REQUESTED

September 1, 2022

Mr. Douglas H. Aeilts                                    Mr. Terry L. Kouba, President
CEO and General Manager                                  Interstate Power and Light Company
Northeast Missouri Electric Power Cooperative            200 First Street S.E.
3705 Bs 61                                               Cedar Rapids, IA 52401
P.O. Box 191
Palmyra, MO 63461-0191                                   Midcontinent Independent System
                                                         Operator, Inc.
                                                         720 City Center Drive
                                                         Carmel, IN 46032

        Re: Termination Letter - MISO Attachment P, Grandfathered Agreement #14

Dear Sirs,

This letter is written pursuant to the Amended and Restated Interconnection and Transmission
Service Agreement (Agreement or GFA14) between Northeast Missouri Electric Power
Cooperative (NEMO) and ITC Midwest LLC (ITCM) and Midwest Independent Transmission
System Operator, Inc. (MISO) and Interstate Power and Light Company (IPL) effective February
1, 2012.

Pursuant to the Termination provision under the Agreement, this letter shall serve as ITC's
notice to NEMO and MISO of ITCM's intent to terminate the above-referenced Agreement,
effective two (2) years from the date of this letter (the "Termination Effective Date").

Furthermore, and prior to the Termination Effective Date of the Agreement, ITCM expects
cooperation from all parties when it initiates, in accordance with Good Utility Practice, a new
required interconnection agreement (Distribution-to -Transmission Agreement or DTIA) to
continue the operation of the interconnection points between ITCM and NEMO.

Sincerely,

DocuSigned by:

*Dusky Terry*

ADD4D0ED8807473...

Dusky Terry
Vice President, ITC Holdings Corp. and President, ITC Midwest LLC

Document Access...

**From:** Terry, Dusky <DTerry@Itctransco.com>
**Sent:** Friday, August 30, 2024 9:24 AM
**To:** Douglas H. Aeilts <daeilts@northeast-power.coop>
**Cc:** Walter, Robert <rwalter@Itctransco.com>; Curtis, Aaron <acurtis@Itctransco.com>; Skyler Wiegmann <swiegmann@northeast-power.coop>; Jamieson, Andrew <AJAMIESON@Itctransco.com>
**Subject:** RE: GFA Termination and Proposed DTIA

**EXTERNAL EMAIL**
This email originated from outside Northeast Power. Do not click any links or open any attachments unless you trust the sender and know the content is safe. If you have any questions, please contact IT.

Doug-

Pursuant to the September 1, 2022, Termination Letter, ITC Midwest LLC intends to contact MISO to initiate the submission of a notice of cancellation of the Amended and Restated Interconnection and Transmission Service Agreement (GFA) on or around September 9, 2024.

To accommodate the notice of cancellation, we are providing the attached execution-ready DTIA. Please execute this document by September 9, 2024. If you will not execute the document, please identify the specific provisions or excluded provisions that you are unable to accept. ITC Midwest intends to proceed with an unexecuted submission to FERC if necessary. In either case, the requested effective date of the DTIA will align with the requested effective date of the GFA termination included in MISO's forthcoming termination filing.

Thanks,
Dusky

**Exhibit 1, page 33**

# DISTRIBUTION-TRANSMISSION INTERCONNECTION AGREEMENT

# BETWEEN

# ITC MIDWEST LLC

# AND

# Northeast Missouri Electric Power Cooperative

Tariff Submitter:  ITC Midwest LLC
FERC Tariff Program Name:  Electric TCS and MBR
Tariff Title:  ITC Midwest LLC - ITC Midwest Agreements II
Tariff Record Title: NEP Distribution-Transmission Interconnection Agreement
Record Content Description:  ITC Midwest RS 235
Tariff Record Proposed Effective Date:  January 1, 2025
Option Code:  A

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

DISTRIBUTION-TRANSMISSION INTERCONNECTION AGREEMENT

BETWEEN

ITC MIDWEST, LLC

AND

Northeast Missouri Electric Power Cooperative

This DISTRIBUTION-TRANSMISSION INTERCONNECTION AGREEMENT, herein termed "Agreement" between ITC Midwest, LLC, a Michigan limited liability company, 27175 Energy Way, Novi, Michigan, herein termed "Transmission Owner", and Northeast Missouri Electric Power Cooperative herein termed "Interconnection Customer". Transmission Owner and Interconnection Customer are sometimes referred to individually as "Party" and collectively as "Parties" where appropriate.

WHEREAS, Transmission Owner and Interconnection Customer desire to enter into this Distribution-Transmission Interconnection Agreement for the purposes, among others, of: (a) describing the general facilities, and the ownership thereof, that shall be used at the interconnection site in establishing the Connection Facilities, respective ownership of facilities, obligations and rights of each of the Parties with respect to procurement, installation, operation and maintenance of such facilities; and (b) describing other procedures that are necessary to maintain safety, reliability and integrity on the Parties' systems as a result of establishing the Connection Facilities at the interconnection site; and

WHEREAS, Transmission Owner is an Appendix I member of the Midcontinent Independent System Operator, Inc. ("MISO") and transmission service and functional control over facilities developed and owned by the Transmission Owner are provided pursuant to Midcontinent Independent System Operator's ("MISO") Open Access Transmission, Energy and Operating Reserve Markets Tariff ("Tariff" or "MISO Tariff").

NOW, THEREFORE, in consideration of the mutual covenants and agreements below, the Parties agree as follows:

## SECTION 1. CONNECTION FACILITIES

1.1   General

The Parties will provide, as specified in this Section 1 certain electric facilities and associated appurtenances which will be used in the connection of the Interconnection Customer's distribution substations or facilities to the Transmission Owner's electric transmission system.

1.1.1   Appendix A1 describes Interconnection Customer's Connection Facilities and Appendix A2 describes Transmission Owner's Connection Facilities, each of

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

which may be individually or collectively referred to as the "Connection Facilities".

1.1.2    Each Party shall bear the cost of maintaining, operating, repairing or replacing its Connection Facilities unless otherwise specified in this Agreement.

1.1.3    In the event future changes in: (i) design or operation of Interconnection Customer's system; (ii) Federal, state or local laws, regulations or codes; or (iii) design or operation of Transmission Owner's system, later necessitate additional facilities or modifications to the then existing Connection Facilities herein, the Parties shall undertake such additions or modifications as may be necessary.  Any modification of Connection Facilities that directly impacts the other Party such that modifications are required to the other Party's Connection Facilities, including modifications to operations of the Connection Facilities, shall only be allowed if mutually agreed to by the Parties.

1.1.3.1 Before undertaking such future additions or modifications, the Parties shall consult, develop plans and coordinate schedules of activities.

1.1.3.2 The cost of such future additions or modifications to the Interconnection Customer Connection Facilities shall be borne by the Interconnection Customer.

1.1.3.3  The cost of such future additions or modifications to the Transmission Owner Connection Facilities shall be recovered through the Transmission Owner's Open Access Transmission Tariff on file with the Federal Energy Regulatory Commission ('FERC"), and shall not be directly assigned or charged to the Interconnection Customer, unless such cost  is approved or required by the appropriate regulatory agency to be assigned to Interconnection Customer; or such future additions or modifications are requested by the Interconnection Customer and such request exceeds Transmission Owner's guidelines for facilities provided to a similarly situated customer.

1.1.3.4  The ownership, operation, maintenance, and replacement responsibilities for any such future additions or modifications shall be made consistent with the responsibilities allocated in this Agreement.

1.2   Interconnection Customer Connection Facilities

Interconnection Customer shall own, pay for and maintain Interconnection Customer Connection Facilities as described in Appendix A1.  In addition to the Interconnection Customer Connection Facilities described in Appendix A1, the Interconnection Customer is required to own, pay for and maintain the following Interconnection Customer Connection Facilities:

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

1.2.1   Interconnection billing and load control metering equipment which is compliant with MISO and Local Balancing Authority's (as defined under MISO's tariff) meter specifications;

1.2.2   Communication interface equipment and an Interconnection Customer's Remote Terminal Unit which shall provide, via industry acceptable means, data to the Transmission Owner's designated power control center. The Interconnection Customer shall provide to the applicable Meter Data Management Agent (the "MDMA"), Transmission Owner and, if necessary, to those third parties that require such data to calculate network load access via industry acceptable means to the billing metering data on terms acceptable to the Parties.  The MDMA shall be responsible for reporting such data to MISO.

## 1.3   Transmission Owner Connection Facilities

Transmission Owner shall own, pay for, operate and maintain Transmission Owner Interconnection Connection Facilities described in Appendix A2.

## 1.4   Connection Point and the Point of Change in Facility Ownership

The Connection Point(s) and the Point(s) of Change in facility ownership between the Parties for each Interconnection shall be  as described in Appendix A1. The Point of Delivery shall be at the Connection Point.

## 1.5   Transmission Owner Equipment Relocation Requested by Interconnection Customer

If at any time Interconnection Customer requires those facilities located on its premises but provided and owned by Transmission Owner to be relocated on such premises, Transmission Owner shall at Interconnection Customer's expense and upon Interconnection Customer's request relocate the same or give permission for Interconnection Customer to relocate the same.

## 1.6   Facilities Added in the Future

If and when additional facilities that are Connection Facilities are added  by Interconnection Customer or by Transmission Owner, it is agreed that each Party shall, at no cost to the other Party, install (or cause to be installed) facilities and/or protective systems that shall provide for the isolation of any electrical faults that occur on the interconnected systems of either the Interconnection Customer or Transmission Owner from having an effect on the other Party's interconnected system.  The addition of new Points of Interconnection or Connection Facilities shall only be allowed if mutually agreed to by the Parties.

1.6.1   The facilities and/or protective relay systems shall be designed to fit into the electrical system configuration and shall be acceptable to the Parties.

**Exhibit 1, page 37**

1.6.2   Transmission Owner and Interconnection Customer agree that each shall give a 90-day advance notice to the other Party of any such additions which it may contemplate making so as to attain the best practicable coordination of future system plans and the design of any necessary facilities.

1.7   <u>Payments</u>

1.7.1   All payments to Transmission Owner shall be made payable to ITC Midwest, LLC, and shall be sent to:

ITC Midwest, LLC

PO Box 673971

Detroit, MI 48267-3971

or by wire transfer to a bank designated by Transmission Owner.

1.7.2   All payments to Interconnection Customer shall be made payable to the Interconnection customer and shall be sent to:

Northeast Missouri Electric Power Cooperative

3705 North Business 61

P.O. Box 191

Palmyra, MO 63461-0191

or by wire transfer to a bank designated by Interconnection Customer.

1.7.3   Invoices shall be due 30 days from the date the invoice is issued. Any invoice payment not made on or before the due date shall bear interest, from the due date until the date upon which payment is made, at an annual percent rate of interest equal to the lesser of (a) the prime rate published by the Wall Street Journal on the due date, plus (2%), or (b) the highest rate permitted by law.

## SECTION 2. DESIGN AND CONSTRUCTION OF THE CONNECTION FACILITIES

2.1   <u>Authority for Interconnection Customer Construction</u>

Except as provided in the subsection 2.1.1, Interconnection Customer shall have sole authority to manage, design, supervise, construct, procure materials for, control and take

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

all steps which it deems necessary or appropriate for the installation of the Connection Facilities required pursuant to Subsection 1.2, "Interconnection Customer Connection Facilities".

> 2.1.1   The design, specifications, installation and construction of the Connection Facilities required pursuant to Subsection 1.2, shall be in accordance with Good Utility Practice as defined in Section 3.1, and compatible with standards used by the Transmission Owner for its own installations at similar voltages.

> 2.1.2   The design and specifications of any new Connection Facilities required pursuant to Subsection 1.2 shall be subject to the inspection of and comment by Transmission Owner prior to being placed into operation. However, Transmission Owner shall have no obligation or responsibility with respect to such design, plans, specifications, installation or construction because of its inspection and comment thereon.

> 2.1.3   Transmission Owner shall connect to Interconnection Customer Connection Facilities if, and only if, the specifications, design, installation and construction of Interconnection Customer Connection Facilities are in accordance with Good Utility Practice as defined in Section 3.1 and compatible with standards used by the Transmission Owner for its own installations at similar voltages.

2.2   Authority for Transmission Owner Construction

Transmission Owner shall have sole authority to manage, design, supervise, construct, procure materials for, control and shall take all steps which it deems necessary or appropriate for the installation and connection of its Connection Facilities required pursuant to Subsection 1.3, "Transmission Owner Connection Facilities" in accordance with Good Utility Practice as defined in Section 3.1.

## SECTION 3. OPERATION AND MAINTENANCE

3.1   Operation and Maintenance by Transmission Owner

Transmission Owner (a) shall have sole authority and responsibility to operate and maintain Transmission Owner Connection Facilities required pursuant to Subsection 1.3 in accordance with "Good Utility Practice", and (b) may perform emergency maintenance, or make system modifications, when necessary, on the Transmission Owner Connection Facilities. Good Utility Practice means any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, including compliance with FERC-approved Reliability Standards of the North American Electric Reliability Corporation, or its successor organization, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices,

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

reliability, safety and expedition. Good Utility Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather intended to include acceptable practices, methods, or acts generally accepted in the region, including those practices required by Federal Power Act Section 215(a)(4).

3.2   Operation and Maintenance by Interconnection Customer

Interconnection Customer shall have sole authority and responsibility to operate and maintain the Interconnection Customer Connection Facilities required pursuant to Subsection 1.2 in accordance with Good Utility Practice. Should the Interconnection Customer fail to maintain its equipment according to Good Utility Practice, the Transmission Owner shall notify the Interconnection Customer of such and shall have sole authority to either disconnect the Interconnection Customer's facilities until such time maintenance work is completed or to perform the necessary maintenance work at the Interconnection Customer's expense.

3.3  Insurance

> 3.3.1   Each Party shall acquire and maintain property insurance on its Connection Facilities.

> 3.3.2   Commercial general liability insurance as such insurances relate to the Connection Facilities and to the site upon which the Connection Facilities are to be located shall be maintained by each Party. Such insurance policy shall name the other Party as an additional insured. Upon request of a Party, the other Party shall deliver a certificate of insurance as it relates to this Agreement.

3.4   Taxes

Any applicable taxes or assessments levied or incurred as a result of a Party's Connection Facilities or business activities, shall be the responsibility of that Party. Each Party shall indemnify and hold harmless the other Party on account of any such taxes and assessments. Taxes include, but are not limited to, applicable real and personal property taxes. If Interconnection Customer's payment for any work under the Agreement constitutes a Contribution in Aid of Construction Agreement (CIAC), the tax obligation will include a gross-up based on the current annual tax rate. The tax gross-up will be calculated using the following method: Current Tax Rate x (Gross Income Amount – Present Value Depreciation Amount) / (1 – Current Tax Rate). While the estimate will be intended to cover the entire tax obligation, Interconnection Customer agrees to reimburse Transmission Owner for such additional taxes, including penalty and interest payments, if any, imposed by the Internal Revenue Service or other taxing authority with jurisdiction over any work within thirty (30) days of notice provided by ITC Midwest of such tax obligation.

3.5   Environmental Safety

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

Each Party agrees to construct, maintain and operate its Connection Facilities so as not to create or exacerbate any environmental hazard or risk. If a Party creates an environmental hazard at the site, that Party agrees to promptly and at its sole expense remediate the hazard and be responsible for all due care activities.

## SECTION 4. CONFIDENTIAL INFORMATION

### 4.1 "Confidential Information"

Confidential information includes, but is not limited to, technical information, information about product plans and strategies, promotions, customers and related technical, Critical Energy Infrastructure Information ("CEII"), financial or business information which the disclosing Party (the "Disclosing Party") considers to be the confidential information of the Disclosing Party or its third-party contractors, licensors or suppliers. Confidential Information shall be (a) written information received from the Disclosing Party which is marked or identified as confidential; or (b) oral or visual (or other non-tangible format) information identified as confidential at the time of disclosure which is summarized in writing to the receiving Party (the "Receiving Party") promptly after such disclosure; or (c) information which a reasonable person under the circumstances would know the Disclosing Party intended to be treated as Confidential Information.

### 4.2 Protection of Confidential Information

The Receiving Party shall use the same degree of care that it uses to protect the confidentiality of its own confidential information of like kind (but in no event less than reasonable care) (a) not to use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement, and (b) except as otherwise authorized by the Disclosing Party in writing, to limit access to Confidential Information or CEII of the Disclosing Party to those of its, and its affiliates, employees, consultants, contractors and agents who need such access for purposes consistent with this Agreement and who have signed confidentiality agreements with the Receiving Party containing protections of the Disclosing Party's Confidential Information or CEII. Each of the Parties will be responsible for the actions of its affiliates and their respective employees, consultants, contractors and agents in violation of this Section 4.

### 4.3 Exceptions

The confidentiality obligations will not extend to information that: (a) was already known by or available to the Receiving Party without obligation of confidentiality prior to disclosure under this Agreement; (b) is or becomes publicly known without breach by the Receiving Party; (c) is rightfully received by the Receiving Party from a third party without a duty of confidentiality; (d) is independently developed or learned by the Receiving Party without use of the Disclosing Party's Confidential Information; (e) is disclosed by the Receiving Party with the Disclosing Party's prior written approval, or (f) is required to be disclosed pursuant to a lawful order of a governmental authority, so long

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

as the Party required to disclose the information provides the Party owning such Confidential Information with timely prior notice of such requirement and provided that such information will remain confidential for all other purposes under this Agreement.

4.4    Remedies Regarding Confidentiality

The Parties agree that monetary damages by themselves will be inadequate to compensate a Party for the other Party's breach of its obligations under this Section 4. Each Party accordingly agrees that the other Party is entitled to adequate relief, by way of injunction or otherwise, if it breaches its obligation under this Section.

**SECTION 5. SERVICE CONDITIONS**

5.1  Reactive Control

5.1.1    Transmission Owner and Interconnection Customer recognize and further agree that Interconnection Customer and Transmission Owner have a mutual responsibility for maintaining voltage at each Interconnection Point, in accordance with Good Utility Practice, the requirements herein and any applicable reliability standards.

(i)    Interconnection Customer shall maintain a system average power factor of at least 98% leading or lagging, as measured at the distribution side of the Interconnection Point(s), at load levels greater than 90% of the Interconnection Customer's monthly system peak load.

(ii)    Interconnection Customer shall maintain a system average power factor between 90% leading and 90% lagging, as measured at the distribution side of the Interconnection Point(s), at load levels less than 90% of the Interconnection Customer's monthly system peak load.

(iii)    The Transmission Owner shall have the ability to request the Interconnection Customer to correct power factor(s) at delivery points in an area or region requiring reactive support. Upon request by Transmission Owner, Interconnection Customer shall use reasonable efforts to correct power factor in a timely fashion.

(iv)    Transmission Owner recognizes that there may be situations where power factor correction is best accomplished on the Transmission System. The Transmission Owner shall use reasonable efforts to make appropriate changes to the system to compensate for reactive power losses.

(v)    The Parties agree to cooperate in the installation and management of reactive power resources connected to their respective systems.

### 5.2  Continuity of Service

Each Party shall exercise reasonable care to maintain continuity of service over its facilities as provided under this Agreement. If continuity of service becomes interrupted for scheduled and unscheduled outages, maintenance, shutdowns or any reason (collectively, "interruption of service") the cause of the interruption of service shall be removed as soon as practicable and normal operating conditions shall be restored. Neither Party shall be responsible to the other Party for any damage or loss of revenue or other liability, damage or expense of any kind whatsoever, caused by or resulting from or in connection with any interruption of service. Settlement of strikes and labor disturbances shall be wholly within the discretion of the Party having such difficulty.

### 5.3  Transmission Service

Transmission Owner makes no representations to Interconnection Customer regarding the availability of transmission service, and Interconnection Customer agrees that the availability of transmission service may not be inferred or implied from Transmission Owner's execution of this Agreement.  Interconnection Customer must request such service in accordance with the provisions of the MISO Tariff. Interconnection Customer must maintain transmission service for the duration of the Agreement, and must demonstrate its compliance with this requirement, if requested by Transmission Owner.

### 5.4  Access Rights

Upon reasonable notice, each Party (a) shall furnish *at no cost* to the other Party any rights of use, licenses, rights of way and easements with respect to lands owned or controlled by the furnishing Party that are necessary to enable the other Party to obtain ingress and egress to construct, reconstruct, operate, maintain, repair, test (or witness testing), inspect, replace or remove facilities and equipment to:  (i) interconnect the Connection Facilities; (ii) operate and maintain the Connection Facilities;  and (iii) disconnect or remove the other Party's facilities and equipment upon termination of this Agreement, and (b) shall grant to the other Party any necessary easements in a form that is acceptable to the other Party.

### 5.5 NERC Responsibilities

Transmission Owner, as the NERC-registered Transmission Operator, has the authority, as described in NERC's Reliability Standards, to issue directives to Interconnection Customer to ensure the reliability of the Bulk Electric System. These directives may include but are not limited to: a) changes in a generator's real or reactive output; and b) the shedding of firm load.

## SECTION 6. INDEMNITY; LIMITATION ON LIABILITY; FORCE MAJEIJRE

### 6.1  Indemnity

To the fullest extent permitted by law, each Party shall at all times assume all liability for, and shall indemnify and save the other Party and its officers, directors, employees, affiliate companies, and agents harmless from, any and all damages, losses, claims, demands, suits, recoveries, costs, legal fees, and expenses for injury to or death of any person or persons whomsoever occurring on its own system, or for any loss, destruction of or damage to any property of third persons, firms, corporations or other entities occurring on its own system, arising out of or resulting from, either directly or indirectly, its own facilities, or arising out of or resulting from, either directly or indirectly, any electric energy furnished to it after such energy has been delivered to it by such other Party, unless caused by the sole negligence or intentional wrongdoing of the other Party, its officers, directors, employees, agents, or invitees.

6.2   Limitation on Liability

NEITHER PARTY SHALL IN ANY EVENT BE LIABLE TO THE OTHER FOR ANY SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES SUCH AS, BUT NOT LIMITED TO, LOST PROFITS, REVENUE OR GOODWILL, INTEREST, LOSS BY REASON OF SHUTDOWN OR NON-OPERATION OF EQUIPMENT OR MACHINERY, INCREASED EXPENSE OF OPERATION OF EQUIPMENT OR MACHINERY, COST OF PURCHASED OR REPLACEMENT POWER OR SERVICES OR CLAIMS BY CUSTOMERS, WHETHER SUCH LOSS IS BASED ON CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS SECTION 6.2 SHALL NOT APPLY TO OR AFFECT THE PARTIES' OBLIGATIONS FOR INDEMNIFICATION AS SET FORTH IN SECTION 6.1.

6.3   Force Majeure

IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY ACT, OMISSION OR CIRCUMSTANCE OCCASIONED BY OR IN CONSEQUENCE OF ANY ACT OF GOD, LABOR DISTURBANCE, ACT OF THE PUBLIC ENEMY, WAR, INSURRECTION, RIOT, FIRE, STORM OR FLOOD, EXPLOSION, BREAKAGE OR ACCIDENT TO MACHINERY OR EQUIPMENT, CURTAILMENT, ORDER, REGULATION OR RESTRICTION IMPOSED BY GOVERNMENTAL, MILITARY OR LAWFULLY ESTABLISHED CIVILIAN AUTHORITIES OR BY THE MAKING OF NECESSARY REPAIRS UPON THE PROPERTY OR EQUIPMENT OF EITHER PARTY, OR BY ANY OTHER CAUSE OR CAUSES BEYOND EITHER PARTY'S REASONABLE CONTROL. NEITHER PARTY SHALL BE REQUIRED TO SETTLE ANY STRIKE OR OTHER LABOR PROBLEM IN A MANNER NOT COMPLETELY SATISFACTORY TO IT.

**SECTION 7. SUCCESSORS AND ASSIGNS**

7.1   Binding Effect

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the respective Parties.

7.2 <u>Assignment</u>

Neither Party shall assign, transfer or otherwise alienate its interest in this Agreement in whole or in part without the prior written consent of the other Party, which consent shall not be unreasonably withheld. Any attempted assignment without securing the consent of the other Party shall be null and void, and of no force and effect.

## SECTION 8. NOTICE TO PARTIES

Unless otherwise provided in this Agreement, any notice, consent or other communication required to be made under this Agreement shall be in writing and shall be mailed by first class US mail, postage prepaid or delivered to the address set forth below or such other address as the receiving Party may designate in writing.

ITC Midwest, LLC
27175 Energy Way
Novi, MI 48377
Attention: V.P. & General Counsel – Utility Operations


Northeast Missouri Electric Power Cooperative
3705 North Business 61
P.O. Box 191
Palmyra, MO 63461-0191
Attention :

All notices shall be effective when received.

For questions and concerns of Emergency Operations contact, as applicable, MISO or the Transmission Owner Operations Control Room per the Transmission Owner - Interconnection Customer Operating Procedure, a copy of which has been provided to Interconnection Customer.

## SECTION 9. GOVERNING LAW

This Agreement shall be deemed to be an Iowa contract and shall be construed in accordance with and governed by the laws of Iowa, exclusive of its conflict of laws principles.

## SECTION 10. EFFECTIVE DATE, TERM AND TERMINATION

This Agreement shall be effective when accepted or ordered by the Federal Energy

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

Regulatory Commission and shall continue in full force and effect so long as any Interconnection Customer Connection Facilities are connected to Transmission Owner Connection Facilities for transmission service, except that it may be terminated by mutual agreement of the Parties and upon not less than 24 months written notice given by either of the Parties.

## SECTION 11. RETIREMENT

At such time as the interconnection is no longer required, the retirement of the facilities comprising the Interconnection shall be the responsibility of the Party owning such facilities. The retirement and removal of facilities shall be done as expeditiously as possible.

## SECTION 12. ENTIRE AGREEMENT, THIRD PARTIES AND AMENDMENTS

This Agreement supersedes all previous representations, understandings, negotiations and agreements either written or oral between the Parties or their representatives and constitutes the entire agreement of the Parties about the Interconnection. This Agreement is intended for the benefit of the Parties only and does not grant any rights to any third parties unless otherwise specifically stated. No amendments or changes to this Agreement shall be binding unless made in writing and duly executed by both Parties.

## SECTION 13. NO JOINT VENTURE OR PARTNERSHIP

This Agreement does not and is not intended to create a joint venture or partnership between the Parties. The rights and obligations of the Parties are entirely contained within this Agreement.

## SECTION 14. NO THIRD PARTY BENEFICIARIES

This Agreement confers no rights or remedies on any third party.

## SECTION 15. DISPUTE RESOLUTION

The Parties agree to use the dispute resolution procedures of the MISO Open Access Transmission, Energy and Operating Reserve Markets Tariff, as they may be amended from time to time, for all disputes, and modified as necessary to be applicable to disputes outside of the MISO's Tariff.

## SECTION 16.  ELECTRONIC TRANSACTIONS

The Parties agree to conduct this transaction by electronic means.  This Agreement may be executed by providing an electronic signature under the terms of the Uniform Electronic Transactions Act.  This Agreement may not be denied legal effect or admissibility as evidence solely because it is in electronic form, permits the completion of the business transaction referenced herein electronically instead of in person, or has

been stored electronically.  As an alternative to physical delivery, any document, including any signed document or written notice may be delivered in electronic form only by the following indicated methods:  _X_ Facsimile _X_ Email ____ Internet ____ No Electronic Delivery.  Documents with original signatures shall be provided upon request of any Party.

## ITC MIDWEST, LLC, a Michigan limited liability company

By: ITC Holdings Corp., a Michigan corporation, its sole member

By: _Dusky Terry_____

Name: __Dusky Terry_____

Title: __Vice President of ITC Holdings Corp. and President__

Date: __10/28/2024 | 8:09:48 AM EDT_____

## Northeast Missouri Electric Power Cooperative

By: _____

Name: _____

Title: _____

Date: _____

Docusign Envelope ID: 50CC9486-0454-44A7-A73F-5334B58D9265
Document Access/Tracking ID: 4cd461ea0fc6c11e

E-FILED  2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

Appendix A1

Interconnection Customer Connection Facilities

Coppock

The facilities comprising the connection are all located in Southwest Quarter of the Northeast quarter of Section 3 Township 73 North Range 8 West , Jefferson County, Iowa. Delivery voltage is at 69 kV.  Point of Interconnection and Change of Ownership is where the Interconnection Customer tap conductors connect to the Transmission Owner line conductor at Transmission Owner Structure 112.

Facilities at the Coppock interconnection including but not limited to the following:

1. An approximately 0.02-mile 69 kV line from Transmission Owner Structure 112 to the Interconnection Customer's Coppock Substation;

2. A disconnecting device on the high side of the Interconnection Customer's transformer, SS-770, within the Interconnection Customer substation;

3. Protective fuse and/or other protective equipment acceptable to Transmission Owner to coordinate with Transmission Owner's protective equipment;

4. Interconnection billing and load control metering equipment which is compliant with MISO and Local Balancing Authority meter specifications.

Harvard

The facilities comprising the connection are all located in Northeast Quarter of the Southeast quarter of Section 1 Township 68 North Range 21 West, Wayne County, Iowa. Delivery voltage is at 69 kV.  Point of Interconnection and Change of Ownership is where the Transmission Owner's conductor meets the insulators on the Interconnection Customer's dead-end structure in the Interconnection Customer's Harvard Substation.

Facilities at the Harvard interconnection including but not limited to the following:

1. A disconnecting device on the high side of the Interconnection Customer's transformer, SS-285, within the Interconnection Customer substation;

2. Protective fuse and/or other protective equipment acceptable to Transmission Owner to coordinate with Transmission Owner's protective equipment;

3. Interconnection billing and load control metering equipment which is compliant with MISO and Local Balancing Authority meter specifications.

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

Melrose

The facilities comprising the connection are all located in Southeast Quarter of the Southwest Quarter of Section 17 Township 72 North Range 19 West, Monroe County, Iowa. Delivery voltage is at 69 kV.  Point of Interconnection and Change of Ownership is where the Interconnection Customer tap conductors connects to the Transmission Owner Switch 69-128.

Facilities at the Melrose interconnection including but not limited to the following:

1. An approximately 1 mile 69 kV line from Transmission Owner Switch 69-128 to the Interconnection Customer's Melrose substation;

2. A disconnecting device on the high side of the Interconnection Customer's transformer, SS-305, within the Interconnection Customer substation;

3. Protective fuse and/or other protective equipment acceptable to Transmission Owner to coordinate with Transmission Owner's protective equipment;

4. Interconnection billing and load control metering equipment which is compliant with MISO and Local Balancing Authority meter specifications.

Numa

The facilities comprising the connection are all located in Northeast Quarter of the Northwest Quarter of Section 24 Township 68 North Range 19 West , Appanoose County, Iowa. Delivery voltage is at 69 kV.  Point of Interconnection and Change of Ownership is where the Transmission Owner's conductor meets the insulators on the Interconnection Customer's dead-end structure in the Interconnection Customer's Numa Substation.

Facilities at the Numa interconnection including but not limited to the following:

1. A disconnecting device on the high side of the Interconnection Customer's transformer, SS-320, within the Interconnection Customer substation;

2. Protective fuse and/or other protective equipment acceptable to Transmission Owner to coordinate with Transmission Owner's protective equipment;

3. Interconnection billing and load control metering equipment which is compliant with MISO and Local Balancing Authority meter specifications.

Perlee

The facilities comprising the connection are all located in Southeast Quarter of the Northwest Quarter of Section 27 Township 73 North Range 9 West , Jefferson County, Iowa. Delivery voltage is at 69 kV.  Point of Interconnection and Change of Ownership is where the Transmission Owner's conductor meets the insulators on the Interconnection Customer's dead-end structure in the Interconnection Customer's Perlee Substation.

Facilities at the Perlee interconnection including but not limited to the following:

1. A disconnecting device on the high side of the Interconnection Customer's transformer, SS-265, within the Interconnection Customer substation;

2. Protective fuse and/or other protective equipment acceptable to Transmission Owner to coordinate with Transmission Owner's protective equipment;

3. Interconnection billing and load control metering equipment which is compliant with MISO and Local Balancing Authority meter specifications.

<u>Weller</u>

The facilities comprising the connection are all located in Southeast Quarter of the Southwest Quarter of Section 13 Township 73 North Range 19 West, Monroe County, Iowa. Delivery voltage is at 69 kV.  Point of Interconnection and Change of Ownership is where the Interconnection Customer tap conductors connects to the Transmission Owner Switch 69-286.

Facilities at the Weller interconnection including but not limited to the following:

1. An approximately 5.2-mile 69 kV line from Transmission Owner Switch 69-286 to the Interconnection Customer's Weller substation;

2. A disconnecting device on the high side of the Interconnection Customer's transformer, SS-270, within the Interconnection Customer substation;

3. Protective fuse and/or other protective equipment acceptable to Transmission Owner to coordinate with Transmission Owner's protective equipment;

4. Interconnection billing and load control metering equipment which is compliant with MISO and Local Balancing Authority meter specifications.

<u>Appendix A2</u>

<u>Transmission Owner Connection Facilities</u>

<u>Coppock</u>

1    Switch 69-141 at the Pleasant Plain Substation
2    Approximately 6.54 miles of 69 kV line from Switch 69-141 to the Coppock substation tap point at Transmission Owner structure 112.
3    Protective relaying and other protective equipment for the protection of equipment of the Transmission Owner.

<u>Harvard</u>

1    Two-way pole top switches 69-220 and 69-222 and an associated pole at the Interconnection Customer tap point.
2    An approximately 0.03 mile tap line from the Transmission Owners system to the Interconnection Customer substation.
3    Protective relaying and other protective equipment for the protection of equipment of the Transmission Owner.

<u>Melrose</u>

1    Three-way pole top switches 69-126, 69-127, and 69-128 and an associated pole at the Interconnection Customer tap point.
2    Protective relaying and other protective equipment for the protection of equipment of the Transmission Owner.

<u>Numa</u>

1    Two-way pole top switches 69-195 and 69-197 and an associated pole at the Interconnection Customer tap point.
2    An approximately 0.03 mile tap line from the Transmission Owners system to the Interconnection Customer substation.
3    Protective relaying and other protective equipment for the protection of equipment of the Transmission Owner.

<u>Perlee</u>

1    Two-way pole top switches 69-168 and 69-187 and an associated pole at the Interconnection Customer tap point.
2    An approximately 0.04 mile tap line from the Transmission Owners system to the Interconnection Customer substation.
3    Protective relaying and other protective equipment for the protection of equipment of the Transmission Owner.

<u>Weller</u>

1  Three-way pole top switches 69-284, 69-285, and 69-286 and an associated pole at the Interconnection Customer tap point.
2  Protective relaying and other protective equipment for the protection of equipment of the Transmission Owner.

E-FILED  2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

FERC rendition of the electronically filed tariff records in Docket No. ER25-00334-000
Filing Data:
CID: C002525
Filing Title: ITC-NEP Distribution-Transmission Interconnection Agreement
Company Filing Identifier: 3
Type of Filing Code: 10
Associated Filing Identifier:
Tariff Title: ITC Midwest Agreements II
Tariff ID: 118
Payment Confirmation:
Suspension Motion: N


Tariff Record Data:
Record Content Description, Tariff Record Title, Record Version Number, Option Code:
 ITC Midwest RS 235, NEP Distribution-Transmission Interconnection Agreement, 0.0.0, A
Record Narative Name:
Tariff Record ID: 50
Tariff Record Collation Value: 50      Tariff Record Parent Identifier: 0
Proposed Date: 2025-01-01
Priority Order: 500
Record Change Type: New
Record Content Type: 2
Associated Filing Identifier:

Document Accession #: 20210112-5100   Filed Date: 01/12/2021

E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

Document Content(s)

ITCMW-NEMO Unexecuted DTIA Transmittal Letter.PDF..........................1
Attachment A - ITSA Correspondence.PDF.....................................8
Attachment B_ITC MW DTIA_RS 235.PDF.......................................11
FERC GENERATED TARIFF FILING.rtf..........................................30

**Exhibit 1, page 54**

EXHIBIT 7

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

---

| | |
|---|---|
| **ITC MIDWEST LLC** | **DOCKET NO. ER25-334-000** |

---

## MOTION FOR LEAVE TO INTERVENE AND PROTEST OF NORTHEAST MISSOURI ELECTRIC POWER COOPERATIVE

Pursuant to Rules 211, 212, and 214 of the Federal Energy Regulatory Commission's ("Commission") Rules of Practice and Procedure,[1] and the Combined Notice of Filings #1 issued by the Acting Deputy Secretary of the Commission on November 1, 2024, Northeast Missouri Electric Power Cooperative ("Northeast Power") hereby submits this motion for leave to intervene and protest in response to ITC Midwest LLC's ("ITC Midwest") November 1, 2024 filing of an unexecuted proposed Distribution-Transmission Interconnection Agreement ("DTIA") between ITC Midwest and Northeast Power in the above-captioned proceeding.[2] As discussed in further detail below, the proposed DTIA included with the November 1 Filing contains disputed provisions that limit interconnection and also excludes provisions for existing interconnection facilities to remain at the Honey Creek and Moravia Substations. These interconnections are necessary in the event that Northeast Power needs to purchase transmission service from the Midcontinent Independent System Operator ("MISO") during Northeast Power system emergencies. Northeast Power thus seeks limited revisions to the DTIA to assure that it has access to alternative transmission service on an emergency or urgent basis without impacting either the

---

[1]    18 C.F.R. §§ 385.211, 385.212, and 385.214 (2024).

[2]    ITC Midwest LLC, ITC-NEP Distribution-Transmission Interconnection Agreement, Docket No. ER25-334-000 (filed Nov. 1, 2024) ("November 1 Filing").

Document Access:on:.....Vip V41Dp..fPp0  E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

Docket No. ER25-334-000

Page 2

reliability or costs of service to ITC Midwest's other customers. Accordingly, Northeast Power

respectfully requests that the Commission reject the as-filed proposed DTIA or direct ITC Midwest

to adopt the limited revisions indicated herein to support interconnections that may be needed to

ensure reliability consistent with Good Utility Practices.

## I.    MOTION FOR LEAVE TO INTERVENE

Northeast Power is a non-jurisdictional cooperative utility headquartered in Palmyra,

Missouri. It is owned by the eight member-distribution cooperatives it serves—three in southeast

Iowa and five in northeast Missouri. The Northeast Power member-distribution cooperatives

provide electric service directly to their member-owners, which include businesses, farms, and

households. These members require the availability of electric service to provide adequate electric

energy for use by modern agricultural, residential, commercial, and industrial equipment. As the

counterparty to ITC Midwest's proposed DTIA, Northeast Power has a direct and substantial

interest in the outcome of this proceeding that cannot be adequately represented by any other

participant. Accordingly, Northeast Power respectfully requests that it be granted full party status

in this proceeding.

## II.   PROTEST

As noted in the November 1 Filing,[3] Northeast Power disputes the inclusion of two specific

provisions in the proposed DTIA—the last sentence of section 1.1.3 and the last sentence of section

1.6—both of which have the intent and effect of limiting Northeast Power's ability to pursue

---

[3]    November 1 Filing – Transmittal Letter at 4.

**Exhibit 1, page 56**

Document Accession... E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

Docket No. ER25-334-000
Page 3

interconnection under the subject agreement.[4] In addition, Northeast Power disputes the exclusion of provisions for interconnection facilities to remain at the Honey Creek and Moravia Substations, which ITC Midwest acknowledges are existing points of interconnection previously included under the Amended and Restated Interconnection and Transmission Service Agreement ("ITSA") among ITC Midwest, Northeast Power, and MISO.[5] However, contrary to the statements contained in ITC Midwest's November 1 Filing, these disputed elements of the proposed DTIA are not necessary to ensure just and reasonable service to ITC Midwest's other customers, and, if approved by the Commission, would compromise reliability by impeding Northeast Power's ability to purchase transmission service from MISO if needed on an emergency basis.

ITC Midwest mischaracterizes Northeast Power's request to maintain the Honey Creek and Moravia interconnections.[6] As Northeast Power made clear in the parties' underlying negotiations with respect to the proposed DTIA, Northeast Power is not requesting the construction of new facilities or any change in ownership of existing infrastructure. Rather, Northeast Power is requesting only to maintain the existing Honey Creek and Moravia interconnections—and is willing to accept responsibility for ongoing maintenance costs and future replacement costs of the line switches that are currently installed. Therefore, the costs associated with maintaining these interconnections would be borne solely by Northeast Power's members and would not increase

---

[4]    November 1 Filing – Attachment B at § 1.1.3 ("Any modification of Connection Facilities that directly impacts the other Party such that modifications are required to the other Party's Connection Facilities, including modifications to operations of the Connection Facilities, shall only be allowed if mutually agreed to by the Parties."); *id.* at § 1.6 ("The addition of new Points of Interconnection or Connection Facilities shall only be allowed if mutually agreed to by the Parties.").

[5]    *See* November 1 Filing – Transmittal Letter at 4. The referenced ITSA is designated as Service Agreement No. 2278 under the MISO Open Access Transmission Tariff. ITC Midwest has sought termination of the ITSA, to be effective January 1, 2025, consistent with the requested effective date of the proposed DTIA.

[6]    *See* November 1 Filing – Transmittal Letter at 4-5.

Document Access... Case 4:24-cv-00434-SHL-SBJ    Document 1-1    Filed 12/09/24    Page 58 of 63
E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

Docket No. ER25-334-000
Page 4

costs or otherwise harm any other customer of ITC Midwest.[7] Further, Northeast Power is willing to stipulate that if an emergency does arise, resulting in Northeast Power requesting that ITC Midwest close the existing switches to allow for access to available transmission capacity on the broader MISO network, any such transmission service would be contingent on ITC Midwest having adequate transmission capacity available on its system. In other words, Northeast Power is seeking only as-available emergency and/or backup transmission service, as opposed to full standby service, and is willing to pay for such service if and when it is utilized.[8] Northeast Power's request for only as-available transmission service in the event of Northeast Power system emergencies is framed specifically to ensure that such a request would not impact ITC Midwest's service to its other customers.

To be clear, Northeast Power believes that it currently has access to sufficient transmission capacity to reliably serve its member loads. As such, Northeast Power does not (nor does it intend to) rely on ITC Midwest's system to achieve baseline reliability. Nevertheless, Northeast Power seeks to maintain the Honey Creek and Moravia interconnections to ensure the highest possible level of reliable service to its members, *i.e.*, redundant reliability, consistent with Good Utility Practices and subject to available transmission capacity on ITC Midwest's system as previously stated. Northeast Power's request therefore is comparable to the emergency tie that was contemplated to be constructed at the Spring Grove interconnection under the expiring ITSA.[9]

---

[7] *Id.* at 4.

[8] *Id.*

[9] *See* Service Agreement No. 2278 at Appendix B. Northeast Power notes that the Spring Grove tie was never actually constructed. It is referenced here as an example of the parties' prior course of dealings.

Document Access: ... E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

Docket No. ER25-334-000
Page 5

Similarly, the Honey Creek and Moravia interconnections are necessary to ensure the highest possible reliability, particularly in the event of an emergency.

ITC Midwest also mischaracterizes the nature of the service requested to be provided at the Honey Creek and Moravia facilities.[10] First, ITC Midwest's references to Order No. 888 in support of the proposition that ITC Midwest is not required to provide backup supply service are inapposite, given that Northeast Power is seeking backup *transmission* service as opposed to backup *supply* service.[11] Second, consistent with the Commission's prior finding in connection with ITC Midwest's November 2, 2021 Petition for Declaratory Order in Docket No. EL22-9-000, references to Northeast Power's decision to establish "alternative primary service" at the Honey Creek and Moravia facilities are misleading to the extent that ITC Midwest is implying that Northeast Power's actions are inconsistent with the terms of the wheeling service previously available at these facilities under the expiring ITSA.[12] Moreover, the contractual basis of the Commission's prior findings with respect to wheeling service under the ITSA does not limit the Commission's broader authority to require transmitting utilities to provide physical interconnection and/or transmission services consistent with the public interest.[13]

Northeast Power's request to maintain the existing interconnections at the Honey Creek and Moravia Substations at Northeast Power's own expense is just and reasonable, especially to ensure the highest possible level of reliable service in the event that Northeast Power needs to purchase transmission service from MISO during Northeast Power system emergencies, subject to

---

[10]   *See* November 1 Filing – Transmittal Letter at 4-5.

[11]   *Id.* at 5.

[12]   *See ITC Midwest LLC*, 178 FERC ¶ 61,150, at PP 37-39 (2022).

[13]   *See, e.g.*, Federal Power Act sections 210, 211, and 212, 16 U.S.C. §§ 824i-k (2018).

Document Accession No. E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

Docket No. ER25-334-000

Page 6

---

available transmission capacity on ITC Midwest's system. Accordingly, Northeast Power respectfully requests that the Commission reject the November 1 Filing, or, in the alternative, direct ITC Midwest to remove the disputed language in sections 1.1.3 and 1.6 of the proposed DTIA and restore the excluded provisions for interconnection facilities to remain at the Honey Creek and Moravia Substations.

## III.    CONCLUSION

WHEREFORE, for the foregoing reasons, Northeast Power respectfully requests that the Commission (i) grant its motion for leave to intervene in this proceeding; and (ii) reject the November 1 Filing, or, alternatively, require that ITC Midwest revise its proposed DTIA as described herein.

Respectfully submitted,

THOMPSON COBURN LLP

/s/ *Nicole S. Allen*

Nicole S. Allen
Peter K. Matt
Jecoliah R. Williams

1909 K Street, NW
Suite 600
Washington, DC 20006
Telephone: 202-585-6900

Counsel for Northeast Missouri Electric Power
  Cooperative

November 22, 2024

Document Access

## CERTIFICATE OF SERVICE

I hereby certify that I have served this day copies of the foregoing on the official service list compiled by the Office of the Secretary in accordance with Rule 2010 of the Commission Rules of Practice and Procedure.

Dated at Washington, D.C., this 22nd day of November, 2024.

/s/ *Nicole S. Allen*

Nicole S. Allen

Thompson Coburn LLP
1909 K Street, NW
Suite 600
Washington, DC 20006
Telephone: 202-585-6900

Document Accessed... E-FILED 2024 DEC 03 4:38 PM APPANOOSE - CLERK OF DISTRICT COURT

Document Content(s)

ER25-334-NE Power Protest of DTIA.pdf.....................................1

E-FILED  2024 DEC 05 4:28 PM APPANOOSE - CLERK OF DISTRICT COURT

### IN THE IOWA DISTRICT COURT FOR APPANOOSE COUNTY

**CASE NO.: CVEQ005881**

### AFFIDAVIT OF SERVICE

**NE MISSOURI ELECTRIC POWER COOP**

      Plaintiff/Petitioner,

vs.

**ITC MIDWEST LLC**

      Defendant/Respondent.

_____/

Received by **Absolute Serving** on **12/04/2024** to be served upon:

**ITC MIDWEST LLC**

**STATE OF IOWA**
**COUNTY OF POLK**    **ss.**

I, **Julia McMahon**, being duly sworn on oath, and over the age of 18 years, do hereby depose and state that:

On **12/05/2024** at **09:05 AM**, I served the within **ORIGINAL NOTICE; PETITION FOR TEMPORARY AND PERMANENT INJUCTIVE RELIEF; EXHIBIT 1-7 on ITC MIDWEST LLC at 400 E COURT AVE, STE 110 , Des Moines, IA 50309** in the manner indicated below:

**CORPORATE SERVICE:** I served the same on the above company, corporation, government official, etc, by delivering a copy to the person named and described below at the address shown above. :

NAME: **MELISSA MILLANG @ CT CORPORATION SYSTEM** TITLE/RELATION: **REGISTERED AGENT**

Fee For Service: **$65.00**

Sworn to and subscribed before me on this
5th day of December, 2024
by an affiant who is personally known to me
or produced identification.

_____
NOTARY PUBLIC

X_____
Julia McMahon
Independent Contractor for:

Absolute Serving
680 18th Street
Des Moines, IA 50314

Atty File#: **NE MISSOURI ELECTRIC** - Our File# **47066**

**SELENA BARKER**
Commission Number 839507
My Commission Expires
5-19-2